**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KYLE J. WILLIAMS,

              Petitioner,                  Case No. 2:22-cv-4125

v.

                                         Watson, J.

WARDEN, MADISON                   Bowman, M.J.
CORRECTIONAL INSTITUTION,

              Respondent.


**<u>ORDER ON MOTION AND REPORT AND RECOMMENDATION</u>**

      Petitioner, a state prisoner proceeding with counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court to consider the Amended Petition (Doc. 3), the state court record (Doc. 7), Respondent's Return of Writ (Doc. 8), and Petitioner's Reply (Doc. 13.)  Also before the Court is Petitioner's Partially Opposed Motion to Expand the Record (Doc. 12), and Respondent's Response to Motion to Expand the Record.  (Doc. 14.)  For the following reasons, the Undersigned **GRANTS IN PART** and **DENIES IN PART** the motion to expand the record (Doc. 12), and **RECOMMENDS** the Petition be **DENIED**, and this action be **DISMISSED**.

**I.  FACTUAL BACKGROUND**

      Following a jury trial in Franklin County, Ohio, Petitioner was convicted of three counts of Rape and was sentenced to nine years in prison as to each count, to be

served concurrently, and classified a Tier III sexual offender. The Ohio Court of

Appeals for the Tenth Appellate District set forth the facts of this case on direct appeal:

{¶ 2} At the heart of the trial were the dueling accounts of prosecuting witness A.P. and defendant Williams. *See, e.g.,* Appellant's Brief at 1-2 ("A.P. testified that [Mr. Williams] raped her. [Mr. Williams] testified that the interaction was consensual. The case turned almost exclusively on their respective credibility."). Jurors heard both accounts. A.P. was subject to vigorous cross-examination, and jurors were entitled to believe the essence of her version. They were not required to believe Mr. Williams.

{¶ 3} At the time of trial, A.P. was a 33-year-old single mother and breast cancer survivor who worked as a make-up artist. Tr. Vol. II at 34-35. Although she had been one year ahead of Mr. Williams at the same high school, they had run in different circles and had not known each other well during their student years. *Id.* at 36-37. They re-encountered each other accidentally at a bar in October of 2017, *id.* at 37; Mr. Williams was insistent that they "had hooked up in high school," and A.P. told him he was mistaken, *id.* at 40, *see also* Tr. Vol. III at 15 (Williams testifies that "[s]he looked similar to someone that I thought she was" from 19 years earlier). After they went their separate ways from the bar, A.P. began a Facebook correspondence with Mr. Williams, Tr. Vol. II at 41; she had thought him "very good-looking," and "it seemed like he was a really nice guy," *id.* at 45.

{¶ 4} They did not meet again in person until March 16, 2018, the day before St. Patrick's Day and during college basketball tournament season. Efforts to meet at a bar the day before had fallen through; after Mr. Williams messaged that he was not in the habit of making plans, A.P. responded, "let's plan on some March Madness tomorrow." *Id.* at 52. They met at an establishment called Classics that Mr. Williams identified as less of a madhouse at the time than Yogi's, another bar they discussed (and where A.P. testified that she was planning eventually to meet her friend Michelle and Michelle's mother). *Id.* at 54, 57. As he was arriving, Mr. Williams texted, "[p]ulling in," to which A.P. responded with *The Office* line, "[t]hat's what she said." *Id.* at 55. As recounted by A.P., she and Mr. Williams had "about two drinks" and "talked about [A.P.'s] journey through cancer and just life." *Id.* at 56. They played pool, and A.P. accepted Mr. Williams's bet that the loser would give the winner a back massage. A.P. lost. *Id.*

{¶ 5} A.P. told the jury that in due course, at about 5:00 in the afternoon, she asked Mr. Williams if he wanted to go with her to meet Michelle and Michelle's mother, and that he suggested that they drive (separately) to his house for a drink and then take an Uber from there. *Id.* at 57-58. She accepted that invitation. *Id.* Once at Mr. Williams's house, she chatted with his housemate and tenant (identified by his later testimony as

Kevin Crook) and his young daughter, who were watching television on the first floor. Mr. Williams then suggested to A.P. that they go downstairs for a drink. *Id.* at 60. A.P. averred that upon going down to the basement, she "immediately felt uncomfortable when [she] saw just a mattress lying on the ground." *Id.* at 60. She did not like the "dark and dirty atmosphere," with "water bottles and half[-]empty liquor bottles" strewn on the floor: she testified as to her impression that "it was odd for somebody who was driving a Jag to just have a mattress in a basement." *Id.* at 61. Mr. Williams explained that he worked in Cincinnati "but owned this condo and rented it out" to others who let him stay there as needed. *Id.* at 62.

{¶ 6} A.P. testified that she sent a text message to her friend Michelle, asking that Michelle call her so that A.P. would have an excuse to leave. *Id.* at 66. On cross-examination, A.P. acknowledged that she had not previously divulged that text, *id.* at 85, 105-06; she offered to show it to defense counsel on her cell phone, an offer he declined, *id.* at 148.

{¶ 7} She did fulfill what she saw as the terms of her bargain by giving Mr. Williams a back massage, she said, although "I was not giving it my best effort." *Id.* at 67. Cross-examined about her report to the police, she said that she had told them that he had taken his shirt off and pulled her onto the bed, saying that he was ready for the massage that she then provided. *Id.* at 119 (adding at 120 "it was just a back massage, and then I planned to leave"). In a later account to police, she said that she had demurred on giving the back rub, wanting more to drink so that she "would be more into it," but that after he pulled her onto the bed, she gave him "a half-assed back massage." *Id.* at 132.

{¶ 8} A.P. testified that she concluded the massage by standing up and asking Mr. Williams who should summon the Uber; she also asked him for a drink, she recounted, and after he said he didn't have anything for her to drink and she said she was getting the Uber, he pushed her back onto the bed with both hands. *Id.* at 68. He unbuttoned his pants, and hers, "[a]nd I kept saying: No, I don't want to do this. And I went to sit up to get him off of me, and then he pushed me back down and grabbed my throat, squeezed, and stuck his finger inside of my vagina." *Id.* at 68-69.

{¶ 9} She reiterated that she had said 'no' and that "after I kept protesting, that's when he put his hands on my throat and started squeezing and choking me." *Id.* at 69. "And I kept saying no, and he wasn't listening." *Id.* at 69-70. A.P. repeated her testimony of digital penetration, and then described painful vaginal penetration. *Id.* at 70. She said that she asked for lubricant "as like a tactic to get him off of me * * * * [a]nd he said he didn't have any." *Id.* at 72. She then described eventual anal penetration, and further rough vaginal intercourse. *Id.* at 72-73.

{¶ 10} When the physical encounter ended, she testified, she put her underwear and pants back on, "ran out" of the basement, and went back upstairs to where "the TV was blaring." *Id.* at 73. The male she had met earlier as Mr. Williams's roommate was there with another adult: "He asked me if Kyle was asleep. I said I don't know, and I left." *Id.* at 73-74.

{¶ 11} A.P. testified that she then drove to Yogi's bar in search of Michelle. *Id.* at 74-75. Michelle was not there, and she drove home. *Id.* at 75. At 6:04 p.m., right after she had left Mr. Williams's condo, he had messaged her: "You bounced like that." *Id.* at 77 and Ex. B. She responded from her home at 8:35 p.m.: "Yeah i did[.] I felt forced to have sex. I'm not going to #metoo or that bullshit. But you need to know - choking a woman shows dominance and [I] said no more than twice ... tonight was not a pleasurable act. It was forced and uncomfortable. I'm letting you know this for the future ... don't do that shit to other women. *i said no[.]" *Id.* at 77 and Ex. B. He replied: "Where you[?]" *Id.* at 78 and Ex. B.

{¶ 12} The next day, A.P. testified, she talked with Michelle and worked a long day at a wedding. *Id.* at 76, 79. On March 18, 2018, the day after that, she spoke with a lawyer friend and then reported the incident to police and underwent a physical examination at the hospital. *Id.* at 80.

{¶ 13} Under cross-examination, A.P. agreed that she had found Mr. Williams attractive and had engaged in their Facebook communications with an eye toward perhaps dating him. *Id.* at 98-99. She agreed that she had not called the police immediately after the incident. *Id.* at 111. She agreed that after she had left Mr. Williams's condo, she encountered her ex-husband at Yogi's (and said that she spoke with him briefly, not mentioning rape or that she was terrified). *Id.* at 112-13. She also said that she lived with her parents, who were at home when she returned on the evening in question, and that she had not shared the events with them. *Id.* at 114-15; *see also id.* at 117-18 ("I did not call the police right away. I was confused. I thought it was my fault. I had a whole day of work. I was so overwhelmed, and I didn't know what to do."). She agreed that she had had a couple drinks, gone down into Mr. Williams's basement, and given him a back massage. *Id.* at 120-21. She also held to her account that she had been "forc[ed] * * * to have sex after I said no." *Id.* at 116.

{¶ 14} Cross-examination explored matters including the prelude to A.P.'s visit to Mr. Williams's condo, *see, e.g., id.* at 99 (Q. "[Y]ou didn't know where the relationship was going to go, but it was going to go somewhere, right?" A. "Right."), 99-106 (tenor of electronic communications); her voluntary decisions to go into Mr. Williams's basement and to give him a back massage there, *see, e.g., id.* at 121 (Q. "in your world, what message does that send to a man when you go down into his basement after you've been at a bar * * *?"); the time lag between the events of March 16 and her

March 18 report to police, *see, e.g., id.* at 111-15; and certain suggested conflicts between her testimony and statements to others, *see, e.g., id.* at 122-23 (whether Mr. Williams took his pants off while on top of her, as stated in police interview, or while standing next to her, as she testified); 127 (whether the lawyer friend she consulted persuaded her to report the incident as opposed to advising her how to do so); 126, 145-46 (did not report digital penetration during first recorded police interview; examining nurse's report does not provide account of digital penetration).

{¶ 15} A.P. did not retreat from her fundamental stance that when Mr. Williams "was on top of me, raping me after I said no, he knew" (in effect that she was not a willing participant). *Id.* at 120; *see also, e.g., id.* at 156-58 (re-direct: flirtatious electronic communications, visit to basement, etc., are not tantamount to consent to sex).

{¶ 16} Mr. Williams testified to his own perspective. "I definitely knew that she was into me," he averred on direct examination. Tr. Vol. III at 17. "I mean, a girl who usually pursues me like multiple times, wants to hang out all the time, pretty much wants more than just a friend." *Id.* at 17-18 (adding when asked "do you mean like some kind of romantic involvement, or something else?": "Yeah, like something more intimate."). But while he saw A.P. as wanting "intimate" companionship, he testified to different initial motives of his own: "I was really just kind of like more of a business relationship with her. So when we kind of like established that we were going to meet up, I asked Kevin [Crook] to come with me for that reason, because I didn't want her to think it was a date kind of situation. * * * * And I was actually trying to hook Kevin and her up." *Id.* at 19. (Although Mr. Crook's earlier testimony had been that Mr. Williams had sounded him out before about a potential business relationship, Tr. Vol. II at 163, and had on that March 16th day asked him to go along to the bar for a business meeting, *id.* at 165, he did not testify to any knowledge that Mr. Williams meant to set him up with A.P. *Compare* Tr. Vol. III at 37 (Williams on cross: Q. "You said you were hoping to hook her up with Kevin. Did you tell Kevin about that?" A. "It might have come up. * * * *"). Mr. Williams elaborated on cross-examination: "I wasn't solely looking to introduce business. I was looking to get to know her to see if she was even a good fit, or maybe even just meeting a friend or having a friend. I'm just saying I wasn't looking forward to – looking for a romantic relationship with her. That wasn't why I was talking with her." *Id.* at 39.

{¶ 17} Mr. Williams's account of some of the background overlapped with A.P.'s. He confirmed, for example, that when he and A.P. had encountered each other in October of 2017, he had said, "I think you and I hooked up back in high school." *Id.* at 15. (At that chance meeting in October, he testified, A.P. had asked him to buy her a drink because her ex-husband was with her and she wanted to make him jealous. *Id.* at 16 ("I

said, I'm not a part of that drama stuff, but I'll add you on Facebook.")). He acknowledged that nothing about their preliminary conversations had indicated that the two were going to have sex. *Id.* at 40 (on cross: "No. But I mean, I did understand that she did kind of like me like that."). He agreed that when he and A.P. then met on March 16, 2018, he proposed the pool game bet of a back massage. *Id.* at 19-20 (adding when asked on direct examination, "from your perspective, had this changed from a prospective business meeting to something else?", "Kind of for her probably. I mean, I knew she was going to give me a back massage on a game that she's horrible at. I think it was pretty obvious that she was, you know, attracted to me"); *see also id.* at 20 (Q. "And were you attracted to her?" A. "Yeah, a little bit."); 43 (on cross: "It wasn't my first time I've used that bet."). And he, too, said that he and A.P. had planned to have a drink at his house before going on to another bar (although he testified that Uber was not discussed and that he had envisioned Mr. Crook driving them). *Id.* at 46-48.

{¶ 18} Mr. Williams's account diverged more dramatically from A.P.'s, however, when he described his version of what went on in his basement. He had not told A.P. before they went downstairs that he used the basement as a bedroom, he acknowledged, *id.* at 51 (on cross), but when he asked, "How about that massage," took his shirt off, lay on the bed, and received his backrub, A.P. appeared comfortable with the situation, he testified. *Id.* at 24-26 (direct: A. "Yeah. Why wouldn't she be?"). After he could feel her tiring from the massage, he told the jury, he "just kind of rolled over," as did she, and they "started making out." *Id.* at 26. From there, he said, "I unbuttoned her pants. I put my hands down her pants and started playing with her vagina" and taking his pants off. *Id.* at 26. "And then I went to take her pants off, and then that's when she said, Hold on a second. Let's drink some more first." *Id.* at 27. "I just said, I don't have any alcohol. We can go get some afterwards, but we're already here. Why don't you just let me put the tip in, and if it doesn't feel good, I'll just take it out and stop." *Id.* A.P.'s response, he said, was to laugh. *Id.* "And then I attempted [to pull her pants down] for the second time, and then that time, she actually helped me." *Id.* at 28. Mr. Williams also told the jury that after A.P. had requested lubricant and been told that he didn't have any, she asked, "how do you want to finish?" *Id.* at 28. In response to his lawyer's question, "How did she appear to you after the sex was over," Mr. Williams answered: "She acted satisfied." *Id.* at 29.

{¶ 19} A.P. then suggested that he go with her to meet her friends at Yogi's bar, Mr. Williams averred, but he said he would wait for Mr. Crook to be free. *Id.* He testified that she then asked to use the bathroom, but when he went upstairs a few minutes later, she was gone. *Id.* at 30 ("I'm like, Seriously?"). Mr. Williams told the jury his sensibilities were offended: "I felt like I was used." *Id.*; *compare id.* at 45 (on cross: "I was open to whatever, even if it was a one-night stand"), 72 (recorded statement of Mr. Williams to police: "This was a one-night stand. It was like nothing more than that.").

6

{¶ 20} Under cross-examination, Mr. Williams disputed the testimony of his tenant Mr. Crook that Mr. Williams had said of sex with A.P. that he had "smashed it." *Compare* Tr. Vol. II at 170 (Crook) with Tr. Vol. III at 59 (Williams). He did acknowledge that after he received the message from A.P. stating that she had felt "forced to have sex[,]" and had "said no more than twice[,]" and enjoining him "[d]on't do that shit to other women* * * * [I] said no[,]" he laughed with his friends about it. Ex. B. and Tr. Vol. III at 60 (also saying, "[t]his girl was just on top of me, asked me to go meet her friends, and look at the text she just sent me. Like psycho."); *see also id.*at 61 ("At that time, it was funny.").

{¶ 21} During cross-examination of Mr. Williams, the jury also heard some of his recorded police interview. At Classics, he said, "I could tell that she was already into it." *Id.* at 68. After they went to his house and basement: "She's giving me a massage. And then when I roll over to seduce, she did say, No, but she said, Let's get one more drink first." *Id.* at 69 (then proceeding at 69-70 with account much along the lines of his testimony, if perhaps more detailed, and arguing, "Why would I rape a girl with an eight-year-old [child] right upstairs?"). When the Detective asked, "[s]o it was basically consensual?" Mr. Williams replied: "Yeah, I would say it was consensual." *Id.* at 70.

{¶ 22} When the cross-examination concluded, defense counsel elected not to ask Mr. Williams any further questions. *Id.* at 76.

{¶ 23} Although A.P. and Mr. Williams were the central witnesses, others did testify. The prosecution began its case by calling the patrol officer who on March 18, 2018 had been dispatched to the hospital after A.P. arrived there and reported an alleged sex crime. Tr. Vol. II at 25-26. He was in the hospital room with A.P. for 10 to 12 minutes, gathering information; asked about A.P.'s "demeanor," he used the words "polite," "upset," and "forthright." *Id.* at 26-27. His brief testimony did not detail the substance of the allegations. *Id.* at 23-33.

{¶ 24} After A.P. testified, the state called Kevin Crook. A retired Air Force and Air National Guard officer who rented a room in Mr. Williams's condo, he said that he had earlier had to decline Mr. Williams's invitation to accompany him to a bar "to speak about his business." *Id.* at 163-65. He was watching television on the first floor with his then seven-year-old daughter and another tenant when Mr. Williams arrived with a woman (now known to have been A.P.). *Id.* at 163-64. "It definitely seemed like they had been drinking[.]" *Id.* at 166.

{¶ 25} Mr. Crook told the jury that after chatting, Mr. Williams and the woman adjourned to the basement: "Approximately 20 minutes later, the

female exited the condo." *Id.* at 168. As she was leaving, he told her it was nice to have met her; "[s]he turned around, smiled and said the same to me and then left. About 5 minutes later, Kyle came up * * * asking where she was. I don't think he was aware that she had left." *Id.* Mr. Williams told him that Mr. Williams and A.P. "had sex." *Id.* at 170 (Mr. Crook's words). During the ensuing "guy talk," Mr. Williams "got into a few of the details." *Id.* "He mentioned that he 'smashed it'[,] was the terminology * * * * He mentioned that they had sex and that she was aggressive. And that something about her —she came on to him very strongly. * * * * Basically, like she attacked him once they got in the basement, like she jumped on him." *Id.*

{¶ 26} Mr. Crook had heard no sounds of struggle or "any sounds whatsoever" coming from the basement. *Id.*at 172. The television had remained on, *id.* at 169, but Mr. Crook testified on cross-examination that he believes he would have heard any commotion; the stairway to the basement is not shut off by any door, and is a "completely open passageway," *id.* at 180; *see also id.* at 181-82.

{¶ 27} A.P.'s friend Michelle testified next. A hairdresser, she works with A.P. in connection with bridal events; A.P. does most of the communication with the brides because she is "straightforward, but calm and collect[ed]." *Id.* at 187. A.P. had invited Michelle, along with Michelle's now-husband and her mother, to meet A.P. and Mr. Williams at Classics "just to kind of be buffers," Michelle related. *Id.* at 188. A.P. subsequently communicated that "[s]he had left Classics and told us that she would meet us over at Yogi's, so we went over there" that afternoon. *Id.* at 189.

{¶ 28} Michelle then testified, without immediate objection, that in the evening, her husband received a text to both of them in which A.P. wrote "that she had just been sexually assaulted." *Id.* at 190. After Michelle described when and how that text was received, the prosecutor asked her: "was there more communication that evening between either you and her or your husband and her?" When Michelle began to answer— "There was. He said --." the trial court sustained a defense objection. *Id.* at 191. The trial court then instructed: "You have to stick to what you observed personally. If you got a text, that's fine, but if you weren't on the text, you can't tell us what the text said, and you can't tell us what your husband told you at the bar about what he was getting." *Id.* Michelle then stated that, "I did text [her] after I had heard what had happened[,]" later saying, "I did just ask if she was okay and if she needed us and what was going on. There were texts back and forth. And all she told me was –." *Id.* The prosecutor then interrupted the witness to note: "You can't speak about what she had said." *Id.* at 192. Michelle reiterated that she had asked about A.P.'s well-being.

{¶ 29} Michelle testified without objection that when she spoke by telephone with A.P. the next day, A.P.'s demeanor was that she was "[s]hocked." *Id.* at 192. Michelle subsequently met A.P. for lunch and heard her account. *Id.* at 192-93. When the prosecutor inquired as to A.P.'s demeanor at that lunch, defense counsel renewed an oral "motion-in-limine objection" that such testimony would be excludable hearsay. *Id.* at 193; *see also id.* at 5-8. The trial court overruled the objection, and Michelle testified that "initially it was very like to the point. She was very like: This is what happened. And as the story went on and the details kind of got a little more in depth, she did start crying a lot, which I had never seen her cry before. I would say she was pretty distraught." *Id.* at 193. Michelle's testimony ended without specifics as to what A.P. said, and the defense declined cross-examination. *Id.* at 195.

{¶ 30} The final witness who testified before Mr. Williams took the stand in his own defense was Ohio Health systems coordinator and forensic nurse overseer Anne Eyre-Stevens. Before she testified, the parties stipulated that a sperm fraction in the vaginal samples nurse Stevens collected from A.P. on March 18, 2018 bore Mr. Williams's DNA, as did A.P.'s oral swab. *Id.* at 199.

{¶ 31} Nurse Stevens, who herself has administered "[o]ver 200" sexual assault examinations and who oversees 40 to 50 sexual assault nurse examiners or trauma-informed nurses at any particular time, spoke of the "very invasive" exam she administered to A.P. on March 18, 2018. *Id.* at 206. Nurse Stevens has been qualified as an expert witness in other litigation, and averred that her primary job responsibilities involve treating sexual assault or trauma-informed patients. *Id.* at 207. She was accepted as an expert witness by the trial court here without objection, and the judge advised the jury that although she could offer medical opinions based on her training and experience, her credibility would be for the jury to determine. *Id.* at 208. Her medical records as based on her interview and examination of A.P. were provided to the jury without objection. *Id.* at 216-18.

{¶ 32} As she testified, those records reflect that A.P. reported to her that "the perpetrator * * * put [his] penis * * * in her vagina and rectum" and that there had been no digital penetration. *Id.* at 220. A.P. also reported that "[h]e used his hands and he was choking me." *Id.* Nurse Stevens documented redness in A.P.'s neck, and bruising of her upper and lower extremities. *Id.* at 222. She applied a "toluidine blue" solution as a stain to "better see injury in the vaginal area," and identified injuries there. *Id.* at 223. And she walked the jury through photographs of the affected areas. *See, e.g., id.* at 232 (Exhibit D3 shows "redness * * * under the chin and the left side of the neck"), 233 (D6 shows "a small area of an abrasion underneath the ear"), 234 (D7 reflects redness and abrasion under the chin; D9 shows

a "small abrasion * * * to the left wrist"; D13 reveals "dark bruising to the left inner arm"), 235 (D17 shows "one-and-a-half-centimeter abrasion to the left knee").

{¶ 33} Nurse Stevens also testified without recorded objection that she does not frequently see vaginal injuries in sexual assault victims; that is due, she said, to the nature of the tissue and to natural lubrication, and "[t]here's also the fight, flight, or freeze" response that can reduce the possibility of such injuries. *Id.* at 239-40. She also said that in her experience, patients who have been sexually assaulted "typically" do not report the crime the day it occurs. *Id.* at 243; *see also id.* at 244 ("I would say the majority of our patients probably come in around the three-day mark or so, two or three days after the assault"); 247 (on cross: does not keep written statistical analysis of reporting lags); 248 (on cross: repeats "it's usually * * * that two-to-three-day mark").

{¶ 34} Nurse Stevens was the state's last witness. Following Mr. Williams's testimony, closing arguments, and instructions, the jury deliberated that afternoon and the next morning for a total of just under four hours; it then returned verdicts of guilty on each of the three rape charges. Tr. Vol. III at 154-61. By entry of November 12, 2019, the trial court denied Mr. Williams's October 3, 2019 motion for a new trial. The trial court sentenced Mr. Williams to prison for nine years on each count, with those sentences running concurrently for a total of nine years imprisonment. November 25, 2019 Judgment Entry. It also imposed a fine of $10,000, ordered restitution of $9,360 (for counseling services), and classified Mr. Williams as a Tier III sex offender. November 25, 2019 Judgment Entry; November 21, 2019 Sentencing Hearing Tr. at 29-30.

*State v. Williams*, No. 19AP-824, 2021-Ohio-3006, 2021 WL 3877939, at *1-7 (Ohio App. 10th Dist. Aug. 31, 2021).

## II.    PROCEDURAL HISTORY

Following the jury verdict and prior to sentencing, defense counsel was permitted to withdraw from the case.  (Doc. 7, at PAGEID # 63.)  Petitioner, represented by new counsel, filed a motion for a new trial, arguing trial counsel provided ineffective assistance, juror misconduct, court bias, and misstatements in closing argument.  (*Id.* at PAGEID # 65.)  By entry dated November 12, 2019, the trial court denied Petitioner's motion for a new trial.  (*Id.* at PAGEID # 86.)

Petitioner filed a timely notice of appeal to the Tenth District Court of Appeals,

raising eight assignments of error:

First Assignment of Error:  The state committed prosecutorial misconduct throughout trial by admitting and arguing character, sympathy, and opinion evidence designed to appeal to the passions and prejudices of the jury, thereby depriving appellant of due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

Second Assignment of Error:  The trial court erred and thereby deprived appellant of due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution by overruling appellant's Crim. R. 29 motion for judgment of acquittal, as there was insufficient evidence to support a conviction.

Third Assignment of Error:   Appellant's convictions were against the manifest weight of the evidence and thereby violated due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

Fourth Assignment of Error:  The trial court erred by admitting improper hearsay evidence in violation of the Rules of Evidence and appellant's rights of confrontation and to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

Fifth Assignment of Error:  The trial court committed plain error by permitting testimony from a state expert in violation of Ohio Criminal Rule 16(K), thereby depriving appellant of due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

Sixth Assignment of Error:  The trial court erred by admitting improper testimony vouching for the veracity and credibility of the alleged victim in violation of the Rules of Evidence and Appellant's right to due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendment[s] to the United States Constitution and comparable provisions of the Ohio Constitution.

Seventh Assignment of Error:  The appellant was denied the effective assistance of counsel contrary to his rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution.

Eighth Assignment of Error:  Under the doctrine of accumulated error, the error committed by the court, the misconduct committed by the state, and the ineffective assistance of appellant's trial counsel warrant reversal.

(Doc. 7, at PAGEID # 109.)  On August 31, 2021, the Tenth District Court of Appeals affirmed the judgment of the trial court.  (*Id*. at PAGEID # 273); *State v. Williams*, No. 19AP-824, 2021-Ohio-3006, 2021 WL 3877939 (Ohio App. 10th Dist. Aug. 31, 2021).

Petitioner appealed the decision of the court of appeals to the Ohio Supreme Court, raising three propositions of law:

PROPOSITION OF LAW NO. 1: Records of a SANE Examination are insufficient to qualify as an expert report unless identified and disclosed as required by Crim. R. 16(K).

PROPOSITION OF LAW NO. 2: The second prong of *Strickland v. Washington* test for ineffective assistance of counsel requires courts to determine whether "confidence in the verdict is undermined," not whether "the verdict would have been different."

PROPOSITION OF LAW NO. 3: Absent any reasonable strategic justification, failure to object to prejudicial expert testimony that violates Crim. R. 16(K) amounts to ineffective assistance of counsel under the Sixth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution.

(Doc. 7, at PAGEID # 311.)  On December 28, 2021, the Ohio Supreme Court declined to exercise jurisdiction over the appeal.  *State v. Williams*, 165 Ohio St.3d 1494 (2021).

### III.  HABEAS PROCEEDINGS

On November 21, 2022, Petitioner, represented by counsel, filed a petition for a writ of habeas corpus, (Doc. 1), followed by an Amended Petition.  (Doc. 3.)  Petitioner sets forth one claim for relief asserting the ineffective assistance of trial counsel, and that claim includes four subparts:

GROUND ONE:  Petitioner was deprived of his Sixth and Fourteenth Amendment right to the effective assistance of trial counsel.

12

Supporting Facts:   Trial counsel's representation of Petitioner during the jury trial was deficient in the following respects:

(1) Trial counsel failed to object to expert opinion testimony by a sexual assault nurse examiner ("SANE"). These opinions included her belief that a) the physical findings of the examination of the prosecuting witness ("PW") were consistent with her claim that she was sexually assaulted; b) findings of vaginal trauma supported the PW's claim of forced sexual relations; c) the PW's delayed reporting of an alleged sexual assault is not "abnormal" behavior; d) "flight, fight or freeze" phenomenon explains the PW's lack of resistance to sexual relations; e) the PW's lack of emotion is not inconsistent with her claim of forced sexual relations; f) a blue dye uptake while performing an examination of the PW's genitals may be indicative of the use of force; and g) the PW's request for lubrication is not inconsistent with the use of force.

The Ohio criminal discovery rule requires the prosecution to serve defense counsel with a written report of an expert witness's findings and opinions prior to trial.  The prosecutor did not provide trial counsel with a written disclosure of the seven categories of expert opinion identified above.  If he had objected on the basis of this discovery violation, trial counsel would have been successful in having the SANE's expert opinion testimony excluded in its entirety.

(2) Trial counsel failed to object to testimony that violated the hearsay rule, the best evidence rule, the lay opinion testimony rule, and Petitioner's rights under the Confrontation Clause.  The prosecutors had elicited improper testimony from the PW's friend that her husband received a text message from the PW, shortly after she and Petitioner had sexual relations, that "she had just been sexually assaulted."  The husband did not testify at the trial, and Petitioner did not have a prior opportunity to cross-examine him.  The prosecutors elicited improper testimony from the PW that she had sent a text to her friend because she felt uncomfortable in Petitioner's basement, and wanted her friend to call her in order to give the PW an excuse to leave.  The text message was not produced in discovery, or offered as an exhibit.  The prosecutors also elicited improper opinion testimony from the PW's friend that the PW was "pretty distraught," and from a police officer that the PW's account of her accusation of forced sexual relations was "forthright."

(3) Trial counsel failed to object to multiple instances of prosecutorial misconduct that were intended to appeal to the passions and prejudices of the jurors. The transcript of the trial discloses that the prosecutors a) elicited testimony and made comments regarding the PW's alleged positive character traits even though Petitioner never made her

character an issue in the trial; b) elicited testimony and made comments regarding alleged negative character traits of Petitioner even though he never made his character an issue in the trial; c) made sympathetic appeals to the jurors based on facts not in evidence; d) elicited testimony about the PW being a breast "cancer survivor", including details about her surviving chemotherapy and a double mastectomy, and serving as an activist within the "young breast cancer community," while inaccurately portraying Petitioner as a shady businessman involved in a pyramid scheme, e) engaged in improper vouching of the PW's testimony by injecting their personal opinions regarding her credibility; f) misstated the facts and law during closing arguments; g) denigrated Petitioner and his attorney during closing arguments; h) impermissibly impeached a prosecution witness who was called in a failed effort to corroborate the PW's testimony; and i) urged the jury to draw an adverse inference from Petitioner's exercise of his right to compulsory process and to present a defense.

(4) Trial counsel failed to object to testimony vouching for the veracity of the PW. This testimony included a) direct opinion testimony supporting the PW's credibility regarding her account of forced sexual relations; b) general testimony about the PW's positive character traits; and c) expert testimony that effectively vouched for the truthfulness of the PW's claims by providing an explanation for the PW's inconsistent demeanor and delayed reporting of her accusations.

Petitioner was prejudiced by his attorneys' deficient performance. There was no eyewitness testimony to corroborate the PW's delayed account of forced sexual relations. The outcome of the trial turned on the jury's assessment of the relative credibility of the PW and Petitioner.

The SANE's opinion testimony provided the prosecution with an excuse for a litany of otherwise exculpatory facts, such as delayed reporting and flat demeanor. The misconduct of the prosecutors inflamed the passions of, and unfairly influenced, the jurors when they resolved the issue of credibility in the favor of the state. The erroneously admitted text message testimony, lay opinion testimony, and vouching testimony provided corroboration for the PW's false accusations, and, individually or in the aggregate, broke the credibility "tie" between her version and Petitioner's version of events. There is a reasonable probability that the jury would have returned not guilty verdicts if defense counsel had timely objected to the expert testimony, the prosecutors' misconduct, and the erroneously admitted text message and vouching testimony.

(Doc. 3, at PAGEID # 24-26.)  On February 3, 2023, Respondent filed a Return of Writ, arguing that subparts two through four of Petitioner's claim are procedurally defaulted,

and that subpart one lacks merit. (Doc. 8.) On April 24, 2023, Petitioner filed his Reply/Traverse. (Doc. 13.)

## IV. PARTIALLY OPPOSED MOTION TO EXPAND THE RECORD

As a preliminary matter, Petitioner moves, pursuant to Rule 7 of the Rules Governing Section 2254 Cases, for an Order granting him leave to expand the record to include (1) Petitioner's "Criminal Rule 16 Demand and Motion for Discovery" and "Request for Notice of Intention to Use Evidence" (filed 9/7/2018), and the State's "Identification of Discovery Provided" (filed 10/11/2018), and (2) certain trial exhibits, specifically, the "Sexual Assault Forensic Exam Forms" pertaining to the sexual assault examination of A.P. (State's Trial Exhibit D), as well as the photographs taken during that examination (State's Trial Exhibits D-1 through D-23). (Doc. 12, at PAGEID # 1397-98.)

Respondent does not object to Petitioner's request to expand the state court record with the discovery documents, but objects to Petitioner's request as it relates to the "exam forms" and photographs of the victim. (Doc. 14, at PAGEID # 1464.) Respondent argues this request "raises issues of privacy," and notes that "jury trial exhibits are usually not included in the state court record upon which habeas corpus cases are decided." (*Id*.)

Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts states that a federal habeas court may direct the parties to supplement the record with additional materials relevant to the Court's resolution of the Petition, and the additional materials that may be supplemented include documents and exhibits. The decision whether to order an expansion of the record under Rule 7 falls within the sound

discretion of the District Court.  *Ford v. Seabold*, 841 F.2d 677, 691 (6th Cir. 1988).

Such expansion "must be limited by the relevance of the proffered materials to the

constitutional claims presented."  *Johnson v. Warden*, No. 2:16-CV-985, 2018 WL

9669761, at *3 (S.D. Ohio June 26, 2018), *objections overruled*, No. 2:16-CV-985, 2018

WL 9662539 (S.D. Ohio Sept. 20, 2018).

Because Petitioner's request to expand the record with the state court discovery

documents is unopposed and the materials are relevant, the Court **GRANTS**

Petitioner's request.  The state court record is hereby expanded to include Petitioner's

"Criminal Rule 16 Demand and Motion for Discovery" and "Request for Notice of

Intention to Use Evidence" (filed 9/7/2018), attached as Exhibit 1 to Petitioner's Motion

to Expand the Record (Doc. 12-1), and the State's "Identification of Discovery Provided"

(filed 10/11/2018), attached as Exhibit 2 (Doc. 12-2).  The Court agrees with

Respondent that the SANE "exam forms" and accompanying photographs are not

needed for the resolution of Petitioner's claim of ineffective assistance of trial counsel.

This information, particularly the photographs of the victim's body, is highly sensitive

and is described adequately in the trial transcript.  (*See* Doc. 7-2, at PAGEID # 850-55.)

This Court does not require physical photographs to resolve Petitioner's habeas claim of

trial counsel ineffectiveness, and Petitioner's request to supplement the record with trial

exhibits D and D-1 through D-23 is **DENIED.**

## V.    STANDARDS OF REVIEW

### A.  AEDPA

In federal habeas corpus, the applicable standard of review governing the

adjudication of constitutional issues raised by a petitioner is set forth in 28 U.S.C. §

2254(d).  Under that provision, a writ of habeas corpus may not issue with respect to

any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established federal law, as determined by the United
> States Supreme Court; or
>
> (2)  resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court

arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of

law or if the state court decides a case differently than the [Supreme] Court has on a set

of materially indistinguishable facts.' "  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011)

(quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).  "A state court's adjudication

only results in an 'unreasonable application' of clearly established federal law when 'the

state court identifies the correct governing legal principle from the [Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case.' "

*Id*. at 599-600 (quoting *Williams*, 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA") was enacted, is a difficult one for habeas petitioners to

meet.  *Id*. at 600.  As the Sixth Circuit in *Otte* explained:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing
> AEDPA's standards.  *See, e.g., Cullen v. Pinholster*, [563] U.S. [170, 181-
> 82, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA
> limits a federal habeas court to the record before the state court where a
> claim has been adjudicated on the merits by the state court).  It is not
> enough for us to determine that the state court's determination is *incorrect*;
> to grant the writ under this clause, we must hold that the state court's
> determination is *unreasonable*…. This is a "substantially higher threshold."
> … To warrant AEDPA deference, a state court's "decision on the merits"

> does not have to give any explanation for its results, *Harrington v. Richter*, [562] U.S. [86, 98-99], 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id*. (emphasis in original).  The Supreme Court extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and is subject to the "restrictive standard of review" set out in § 2254(d).  *See Johnson v. Williams*, 568 U.S. 289, 292 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents."  *Harrington*, 562 U.S. at 102.  In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.

**B.  Procedural Default**

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for

consideration.  28 U.S.C. § 2254(b), (c).  If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Over time, the term "procedural default" has come to describe a situation where a person convicted of a crime in a state court fails (for whatever reason) to properly present a particular claim (or sub-claim) to the highest court of the state so that the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process.  This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted.  That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court.  As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to [the] failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal

habeas case – that is, they are "procedurally defaulted." It is well settled that "[a] common example of a procedural default is a failure to raise a claim in state court in a timely manner." *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (citing the four-part *Maupin* standard). First, the court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Finally, if the court determines that a state procedural rule was not complied with and the rule has an adequate and independent state ground, then the petitioner may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Maupin*, 785 F.2d at 138. In order to establish cause, a petitioner must show that "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The petitioner bears the burden of showing cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999)).

## VI.  DISCUSSION

Petitioner sets forth one claim for relief asserting the ineffective assistance of trial counsel, and that claim includes the following four subparts:  (1) trial counsel failed to object to the expert witness's opinion testimony (SANE); (2) trial counsel failed to object to the admission of hearsay and opinion testimony; (3) trial counsel failed to object to prosecutorial misconduct; and (4) trial counsel failed to object to testimony that vouched for the credibility of the victim.  (Doc. 3.)  In the Return of Writ, Respondent asserts that subparts two, three, and four are procedurally defaulted, because Petitioner failed to appeal the adverse decision of the Tenth District Court of Appeals on these issues to the Ohio Supreme Court.  According to Respondent, before the Ohio Supreme Court, Petitioner limited his claim of ineffective assistance of trial counsel to his claim that trial counsel failed to object to the SANE expert testimony, and Petitioner abandoned the remainder of his allegations of ineffective assistance of trial counsel.  Respondent agrees the first subpart regarding the expert is properly before the Court but argues that subpart lacks merit.

In the Reply/Traverse, Petitioner asserts that all four subparts of his ineffective assistance claim were fairly presented to the Ohio Supreme Court.  Petitioner notes that Rule 7.02(B) of the Ohio Supreme Court Rules of Practice sets a 15-page limit for the jurisdictional memorandum, requiring Petitioner to present his arguments before the Ohio Supreme Court in a "brief and concise" manner.  (Doc. 13, at PAGEID # 1421.)  These rules, Petitioner argues, required him to present "an abbreviated version of the comprehensive presentation" he made in his appellate brief before the Tenth District Court of Appeals.  Petitioner further argues that "§ 2254 does not require any baseline

degree of detail to satisfy the fair presentation requirement."  (*Id*. at PAGEID # 1419-1420.)

A.  **Subparts (2), (3), and (4) Are Not Procedurally Defaulted**

As set forth in the standards of review, a procedural default occurs where a person convicted of a crime in a state court fails to properly present a particular claim to the highest court of the state so the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process.  *McKay v. Genovese*, No. 22-5136, 2022 WL 19409797, at *3 (6th Cir. Aug. 8, 2022).  A claim is "fairly presented" when the petitioner "presented both the factual and legal basis for his claim to the state courts."  *Maze v*. Lester, 564 F. App'x 172, 178 (6th Cir. 2014) (quotation marks and citations omitted).  "Fair presentation does not require word-for-word replication," *Bray v. Andrews,* 640 F.3d 731, 735 (6th Cir. 2011), but § 2254 does require a federal habeas petitioner "to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."  *Anderson v. Harless,* 459 U.S. 4, 6 (1982).  In the specific context of ineffective assistance of counsel claims or subclaims, "to the extent that an ineffective assistance of counsel claim is based upon a different allegedly ineffective action than the claim presented to the state courts, the claim has not been fairly presented to the state courts."  *Maze*, 564 F. App'x. at 178.  Thus, if a claim has multiple subparts, and the petitioner has procedurally defaulted any portion of the claim, the habeas court may only review the merits of the non-defaulted subparts.

Here, the question is whether Petitioner fairly placed before the Ohio Supreme Court the factual and legal substance of the various ineffective assistance of trial

counsel subclaims that he now asserts in habeas corpus.  That determination necessarily requires reference to Petitioner's Memorandum in Support of Jurisdiction before the Ohio Supreme Court.  In the Memorandum, Petitioner alleged:

> Appellant raised numerous claims of ineffective assistance, including trial counsel's failure to object to inadmissible hearsay, improper "vouching" testimony from police and lay witnesses, failure to object to improper closing arguments, and failure to object to inadmissible expert SANE testimony under Crim. R. 16(K).  Under the first prong of *Strickland*, each instance fell below objective standards of practice and could not be justified as reasonable trial strategy.  Each of these instances likewise impacted the outcome in the same prejudicial way – they resulted in evidence, testimony, and argument that improperly bolstered A.P.'s credibility.  Given the context of the case, where credibility was determinative, the deficient performance resulted in prejudice.  *Strickland*, *supra*, *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.
>
> Relying on a misstated, inaccurate, and misapplied definition of the *Strickland* prejudice test, the Tenth District improperly denied each claim of ineffective assistance of counsel.

(Doc. 7, at PAGEID # 319.)

The Court finds Petitioner made a good faith effort to pursue his ineffective assistance of trial counsel subclaims through one complete round of review in the state courts, including raising the claims contained in subparts two, three and four as part of his second proposition of law in his Memorandum in Support of Jurisdiction before the Ohio Supreme Court.  Counsel identified the claimed deficient performance and focused on how the court of appeals handled the "prejudice" prong of the *Strickland* test.  The Court finds this sufficient to provide the Ohio Supreme Court with notice and an opportunity to rule on the claims of ineffective assistance of counsel set forth in subparts two, three and four of Petitioner's First Claim for Relief.

B.  **Petitioner's First Claim for Relief Lacks Merit**

1.  **Standard For Habeas Claims of Ineffective Assistance of Counsel**

23

The AEDPA, coupled with the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the proper framework for assessing Petitioner's claims of ineffective assistance of trial counsel.  Under *Strickland*, claims of ineffective assistance of counsel are subject to a two-prong inquiry which asks: (1) whether trial counsel was deficient in representing the petitioner; and (2) whether trial counsel's alleged deficient performance prejudiced the defense so as to deprive the petitioner of a fair trial.  *Id.* at 687.  To meet the first prong, a petitioner must establish that his counsel's representation "fell below an objective standard of reasonableness," and the petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'"  *Id.* at 688-89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is a "substantial, not just conceivable, likelihood of a different result."  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted).

Where an exhausted claim of ineffective assistance of trial counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  That is, "*Strickland* requires deference to

counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022).  The question then is not whether trial counsel was ineffective, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  In *Harrington*, the Supreme Court clarified the double deference that is due:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal citation omitted).  Petitioner must show the state court's decision is so obviously wrong that its error lies "beyond any possibility for fairminded disagreement." *Id.* at 103.  Congress "meant" this standard to be "difficult to meet." *Id.* at 102.  And Petitioner has not satisfied that standard here.

## 2. Petitioner's Allegations of Ineffective Assistance

### a. Subpart (1)

In subpart (1), Petitioner argues trial counsel failed to object to impermissible expert opinion testimony that was not disclosed in accordance with Ohio Criminal Rule 16(K), which directs that an expert witness for either side "shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications."  The report must be disclosed to the other side no later than twenty-one days prior to trial, and a failure to disclose the report "shall preclude the expert's testimony at trial."  In this case, the State

of Ohio did not provide an expert report and instead provided a multi-page document entitled "Sexual Assault Forensic Exam." Petitioner claims that although these medical records contained physical observations, the records did not include the nurse examiner's "opinions or conclusions, expert or otherwise, regarding the significance of those observations." (Doc. 13, at PAGEID # 1424).

Petitioner claims trial counsel "inexplicably stood silent while the prosecutor . . . proceeded to elicit opinions from the S.A.N.E. that bolstered the state's case, but were not disclosed in discovery." (*Id.*) According to Petitioner, these opinions fall into three categories. First, Petitioner asserts Nurse Stevens expressed opinions regarding potential vaginal injury. This included her opinion that it is "not very common" to see vaginal injuries in sexual assault patients, that the findings of the genital exam in this case was "consistent with the history given by [A.P.]," and that the blue dye uptake noted in the exam records "could" be characterized as vaginal injury or trauma. (*Id.* at PAGEID # 1426; Doc. # 7-2, at PAGEID # 1128-30.) The second category of opinion testimony involves the witness explaining the concept of "fight, flight, or freeze" in traumatic situations. Finally, Petitioner contends the witness opined that the delayed reporting of sexual assault accusations "would not be uncommon." (Doc. # 13, at PAGEID # 1432.)

In support of his arguments, Petitioner cites two Ohio court of appeals cases reversing rape convictions for violations of Ohio Criminal Rule 16(K). In *State v. Walls*, 104 N.E.3d 280 (Oh. App. 6th Dist. 2018), the Ohio Sixth District Court of Appeals determined the testimony of a pediatrician specializing in child abuse exceeded the scope of his written report when he testified about grooming, delayed reporting and

recantation, and testified he had a "gut feeling" and a "medical belief" that the minor child was the victim of long term sexual abuse and incest, despite the alleged victim failing to report any sexual abuse during the examination.  In *State v. McGhee*, No. 2014-T-0106, 2017-Ohio-5773, 2017 WL 2951775 (Oh. App. 11th Dist. June 10, 2017), the State failed to provide a report or disclose the opinion of its expert regarding delayed disclosure in a case involving a minor child.  The court of appeals determined the expert's testimony regarding delayed disclosure was significant in that case, because the minor victim alleged the abuse had been ongoing for four years.

### b.  Subparts (2) through (4)

In subparts (2) through (4), Petitioner argues his trial counsel failed to object to improper hearsay testimony in violation of "Ohio Rule of Evidence 802," as well as improper vouching and prosecutorial misconduct.    (Doc. 13, at PAGEID # 1435-42.) With respect to subpart (2), there are three instances of alleged hearsay testimony that Petitioner claims trial counsel should have objected at trial.  The first and "most egregious instance" of this, Petitioner argues, was when the victim's friend Michelle Kissel was asked whether she had received any communication from the victim, and then proceeded to testify that the victim had texted her (Michelle's) husband shortly after the incident that "she had just been sexually assaulted."  (*Id*. at PAGEID # 1439-40.)  Petitioner asserts:

> The text message was an out-of-court statement offered for the truth of the matter asserted, *i.e.* that A.P. had been sexually assaulted by Petitioner. The prosecution did not offer a copy or image of the message.  The witness's husband did not testify at the trial.  A.P. never said anything about the phantom text on the witness stand.  Kissel's testimony would have been excluded under the hearsay rule as well as the best evidence rule if only trial counsel had objected.

27

Petitioner contends the second instance of objectionable hearsay occurred during the victim's testimony.  Petitioner argues his counsel should have objected to the victim's own testimony that she had texted Michelle to say she felt uncomfortable in Petitioner's basement.  (Doc. 13 at PAGEID # 1440-41.). Petitioner cites the following portion of the trial transcript:

> Q.  So you're down in the basement.  What feeling do you have at this point once you go downstairs?
>
> A.  Uncomfortable. And because I was feeling uncomfortable, I was texting my friend Michelle.  I wanted her to call me so I could get out of the situation without being rude.

(Doc. 7-2, at PAGEID # 685.)  Petitioner characterizes this testimony as "camoflauged" hearsay and argues "[t]he fact that the statement was introduced through the testimony of the declarant does not alter its hearsay nature."  (Doc. 13, at PAGEID # 1441.) Finally, Petitioner argues his counsel should have objected to Michelle Kissel's "description of A.P. being 'shocked'" because this description constitutes "non-verbal" hearsay and allowed the victim's "emotion, behavior and attitude" to be "communicate[d] in an unspoken way."  (*Id*. at PAGEID # 1442.)

In subparts (3) and (4), Petitioner argues trial counsel failed to object to prosecutorial misconduct and vouching.  In subpart (3), Petitioner asserts the assistant prosecutors interjected improper character evidence in violation of Ohio Evidence Rule 404(A), and "played on the sympathies of the jurors."  (Doc. 13, at PAGEID # 1436.) Specifically, Petitioner argues trial counsel failed to object to conduct by the prosecutors that: (1) elicited testimony and commentary about the victim's good character and status as a cancer survivor and breast cancer advocate, (2) portrayed Petitioner as having

"bad character" by implying he engaged in shady business schemes and was a controlling person, and (3) vouched for the victim's testimony by injecting their personal opinions regarding her credibility. (*Id*. at PAGEID # 1436-39.) Petitioner argues this improper character evidence is forbidden by "Ohio Evidence Rule 404(A)," and claims that counsel's failure to object was due to "inattention" and not the result of a strategic decision. (*Id*. at PAGEID # 1437.) In subpart (4), Petitioner contends counsel should have objected to police testimony elicited by the prosecutors that described the victim's demeanor as "forthright." (*Id*. at PAGEID # 1442-43.)

### 3. State Court Decision on the Merits

As his seventh assignment of error on direct appeal, Petitioner argued his trial counsel were ineffective, and the allegations concerning counsel's allegedly deficient performance cross-referenced several other assignments of error. Petitioner asserted the record was "replete with improper hearsay, inadmissible 'vouching' testimony, and improper expert testimony." (Doc. 7, at PAGEID # 166.) Petitioner also alleged counsel failed to investigate the existence of certain text messages through the discovery process, was "distracted by electronic devices," and failed to prepare Petitioner to testify. The Court of Appeals rejected Petitioner's ineffective assistance of counsel claim on the merits:

> {¶ 79} Mr. Williams's seventh assignment of error claims ineffective assistance of counsel. Appellant's Brief at 48-49. Counsel was deficient, he contends, "[b]y failing to object to the inadmissible evidence." *Id*. at 48 (relying on his briefing of other assignments in saying that "[t]he record is replete with improper hearsay, inadmissible 'vouching' testimony, and improper expert testimony"). He adds that "[t]here is no indication [in the record] of any pre-trial efforts to obtain" what he calls "relevant text communication" (perhaps meaning the text that A.P. testified she sent from the basement asking that Michelle call her). Appellant's Brief at 49 (not indicating what sort of "indication" should have appeared, or how the

defense would have been aided by having the text the absence of which trial counsel was able to suggest, at length in closing, showed a conflict in A.P.'s account, *see* Tr. Vol. III at 102-03).

{¶ 80} Last, Mr. Williams cites to allegations against counsel made in his motion for a new trial, *see* Appellant's Brief at 49 (citing materials from October 3, 2019 motion), but he does not offer any response here to the trial court's reasonably detailed analysis of those claims, *see* November 12, 201[9] Journal Entry Denying Motion for New Trial at 2-6 (concluding: "The court finds no support for a claim that defense counsel was ill-prepared before, or deficient during, this trial. Defendant received sensible representation"). And of course he does not assign the trial court's denial of that motion as error here.

{¶ 81} Mr. Williams has the burden of showing both that his trial counsel fell beneath "an objective standard of reasonable representation," and that, under "the same deferential standard" as for plain error, there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *Tench*, 2018-Ohio-5205, ¶ 264, 218, 156 Ohio St.3d 85, 123 N.E.3d 955, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. "In evaluating allegations of deficient conduct by counsel, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."' *State v. Hill*, 10th Dist. No. 09AP-398, 2010-Ohio-1687, ¶ 9, quoting *Strickland* at 687, 104 S.Ct. 2052, further citation omitted.

{¶ 82} Many of the objections that Mr. Williams now proposes in hindsight over the course of his briefing to us would not have had a reasonable opportunity for success, and might have underscored the testimony that he posits here as significant. And even had Michelle's testimony about the message received by her husband the evening of the event (before she spoke with A.P. the next day) been excluded, along with such part of the nurse's expert testimony that arguably went beyond the bounds of her records, we see no reasonable probability that the jury's result would have been different than it was. "Mr. Williams was represented by two retained lawyers," including "a very experienced criminal defense lawyer admitted to the bar in 1985," and they "were on his case from start to finish." Journal Entry Denying Motion for New Trial (a motion cited here by Mr. Williams) at 2. Based on the trial record that is before us, he did not receive ineffective assistance of counsel. We overrule Mr. Williams's seventh assignment of error.

*State v. Williams*, No. 19AP-824, 2021-Ohio-3006, 2021 WL 3877939, at *17-18 (Ohio

App. 10th Dist. Aug. 31, 2021).  Because the state appellate court considered the merits

of Petitioner's ineffective assistance of trial counsel claims, AEDPA deference is due.

### 4.  Petitioner's Arguments Challenging the State Court Decision

Petitioner faults the decision of the Tenth District Court of Appeals and argues

that decision is not deserving of AEDPA deference for three reasons.   First, Petitioner

argues the cumulative effect of counsel's deficient performance in this "weak" case

tipped the balance in favor of the state and any decision to the contrary is

unreasonable.  (Doc. 13, at PAGEID # 1443.)  "The prosecution did not have a strong

case against Williams," Petitioner argues, and this case "fell squarely within the rubric of

a 'he says/she says' credibility battle."  (Doc. 13, at PAGEID 1444.)  According to

Petitioner, a verdict that was "only weakly supported by the record is more likely to have

been affected by errors than one with overwhelming record support."  (*Id*. at PAGEID #

1443.)

Second, Petitioner argues the Tenth District Court of Appeals unreasonably

determined the facts by finding that the medical records "disclose[d] the S.A.N.E's

opinions regarding the 'nature, source, and cause of vaginal injury,'" as opposed to

merely disclosing observations of blue dye uptake.  (Doc. 13, at PAGEID # 1455.). This

mistake of fact is significant, Petitioner argues, because "[t]he appellate panel said it

was factoring in 'such part of the nurse's expert testimony that arguably went beyond

the bounds of her records' as one basis for its conclusion that Williams was not

prejudiced by trial counsel's performance," and "the panel erroneously believed that the

vaginal injury opinion testimony did not go beyond the bounds of her records." (*Id*. at PAGEID # 1456.)

Finally, with respect to the allegations of deficient performance set forth in subparts (2) through (4), Petitioner argues the appellate court failed to correctly apply the *Strickland* standard for determining deficient performance. (Doc. 13, at PAGEID # 1456.) According to Petitioner, the appellate court adopted by reference its plain error review conducted in connection with the freestanding claims of error that corresponded to counsel's failure to object. (*Id*.) "In other words, the appellate panel considered its plain error rulings as being dispositive of Williams' related deficient performance claims." (*Id*. at PAGEID # 1456-57.) Petitioner argues this approach was incorrect, because "[t]o obtain relief for plain error, an Ohio appellant must first demonstrate that the error would have been 'obvious' to the trial judge." (*Id*. at PAGEID # 1458.) Additionally, Petitioner argues "[t]he Ohio Court of Appeals subjected Petitioner to a higher burden than prescribed by *Strickland* when it required him to demonstrate that each category of deficient performance by trial counsel, individually rather than cumulatively, met the more onerous demands of the plain error standard." (*Id*. at PAGEID # 1460.)

### 5. Petitioner's Claims of Ineffective Assistance of Counsel Lack Merit

#### a. Expert Testimony

With respect to Petitioner's first subpart alleging that counsel were ineffective because they failed to object to improper expert testimony, the Court notes that on direct appeal, Petitioner raised two assignments of error relating to Nurse Stevens's testimony. First, as his fifth assignment of error, Petitioner argued the *trial court* erred

by not "intervening" to prevent Nurse Stevens from testifying and offering opinions

beyond the scope of her provided examination records.  The Tenth District Court of

Appeals reviewed this claim for plain error, because trial counsel did not object at trial.

The court concluded no plain error occurred:

> {¶ 73} The fifth assignment posits "plain error" in the trial court's not intervening to prevent the examining nurse from testifying as an expert beyond the bounds of her examination records. Appellant's Brief at 38-45. Those records catalogued A.P.'s hospital account of the event in question and the findings of nurse Stevens's physical examination. Ex. D. As Mr. Williams states, the nurse: "provided comprehensive testimony about statements made by A.P., the results of her physical examination, and what is shown (and not shown) in various photographs taken during the examination. This testimony generally outlined her observations as a fact witness." Appellant's Brief at 38.

> {¶ 74} Mr. Williams does not assign that testimony as error. Rather, he takes issue with what he deems "opinion testimony" outside the scope of her report. *Id.* at 39-40 (citing testimony that: vaginal injuries are "not very common" in sexual assault victims, in part because a body sometimes can "push fluids" to the area; that the vaginal injuries observed here with the Toluidine blue solution could be described as "genital trauma" and were consistent with A.P.'s account; that a sexual assault victim's immediate response may be to fight, flee, or freeze [meaning "there's possibly no resistance," Tr. Vol. II at 242]; that sexual assault victims do not act uniformly when giving their accounts; and that in her experience, it would not be uncommon for a sexual assault victim to come to her on March 18 for an event that happened on March 16).

> {¶ 75} Although the nurse's records as disclosed did in fact reflect "Toluidine blue uptake noted," and repeated with regard to a picture from the vaginal stain examination that "Tb dye up[t]ake noted," *compare* Exhibit D at 4-5 including notes for picture 10 with Appellant's Brief at 39, some of the nurse's testimony (including particularly her more generalized statements explaining fight, flight, or freeze responses and her experience with other patients' reporting lags), did go beyond the contours of her records as apparently timely shared with the defense. Criminal Rule 16(K) as modified in 2010 requires that an expert witness "shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion," and that the report shall be made available to the opposing party at least 21 days before trial: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(K). Consistent with case law, Mr. Williams's opening brief to us

treats the nurse's "SANE exam records" as "her 'report'[.]" Appellant's Brief at 44, *but see* Reply at 14 (arguing incorrectly that there was "no report" and hence "no opportunity for the defense to consult his own expert").

{¶ 76} Mr. Williams is incorrect in suggesting that our review of potentially offending expert testimony here should employ "harmless error analysis" (even while his brief nods to the "plain error" standard in the actual assignment of error). Compare Appellant's Brief at 38 (statement of assignment) *with id.* at 41-42 (regarding harmless error). Nurse Stevens offered the testimony identified here without recorded objection. *See* Tr. Vol. II at 240-44; *compare id.* at 208 (no objection to qualification as an expert). Even should a trial court be charged with responsibility for assessing and policing the contours of expert reports despite lack of objection, the standard of review would be for plain error. *See, e.g., State v. Carpenter*, 7th Dist. No. 19 MO 0010, 2020-Ohio-5295, ¶ 26 ("counsel did not object to [the expert's] testimony or the lack of an expert report. Thus, this matter will be reviewed for plain error"); *compare* State's Brief at 43 ("he must establish plain error"). The case of *State v. Walls*, 6th Dist. No. E-16-027, 2018-Ohio-329, 104 N.E.3d 280, as relied on at pages 43-44 of Appellant's Brief, involved appellate review after the defense at trial "objected and asked that [an 'expert's'] testimony be limited to what was disclosed in the report." *Id.* at ¶ 17. And in that case (relating to allegations of child sex abuse and the "expert's" attempts to move from earlier report conclusions significantly more favorable to the defense to trial testimony of " 'serious psychological issues' that 'would fit with being sexually abused,' " *compare id.* at ¶ 10 *with id.* at ¶ 19), the Sixth District Court of Appeals opined in passing that "a party may waive a violation of Crim.R. 16(K)," *id.* at ¶ 34 (citing cases of belated objections). *State v. McGhee*, 11th Dist. No. 2014-T-0106, 2017-Ohio-5773 (involving "expert" testimony on four-year delayed disclosure that was "vital to the state's case," *id.* at ¶ 20), similarly involved a defense motion to exclude expert testimony under the rule, and the appellate court examined the issue under an abuse of discretion standard. *Id.* at ¶ 13, 15-16.

{¶ 77} Under the plain error standard, and reviewing all of the nurse's testimony as now argued by Mr. Williams to have exceeded the bounds of her records, and considering the use of that specific testimony in the context of the trial as a whole, we do not find that there is a reasonable probability of a different jury result had that particular testimony been excluded. Such exclusion would *not* reach the recorded results of the physical examination conducted by nurse Stevens, including her observations of various bruises, abrasions, and colorations. As Mr. Williams concedes, the jury " 'could have chosen to ignore [the nurse testimony at issue] and still convict' " Appellant's Reply Brief at 11-12, and we do not conclude that there is a reasonable probability that if the jury had ignored that testimony, it would have seen the same degree of "inherent credibility problems" with A.P.'s testimony that Mr.

> Williams urges, *compare id.* at 11. Especially given the testimony of both A.P. and Mr. Williams, we cannot discern any reasonable probability that the jury would have reached a different result had nurse Stevens's testimony been restricted strictly to her recorded examination findings. We overrule the fifth assignment of error.

*Williams*, 2021 WL 3877939, at *15-17 (Ohio App. 10th Dist. Aug. 31, 2021).

On direct appeal, Petitioner raised – in very short and conclusory fashion – counsel's failure to object to the "improper expert testimony" as part of his seventh assignment of error, which set forth his various instances of allegedly ineffective assistance of trial counsel.  (Doc. 7, at PAGEID # 166.)  Petitioner did not elaborate or provide any specific argument regarding the improper expert testimony within his assignment of error, and presumably relied on his prior arguments made in connection with his claim of trial court error concerning the same expert testimony.  Similarly, in revisiting the issue of the expert's testimony in connection with Petitioner's claim of ineffective assistance of trial counsel, the Court of Appeals did not go into significant additional analysis, but nevertheless concluded that Petitioner failed to show the necessary prejudice resulting from any testimony that exceeded the scope of the expert's provided medical records.  With respect to deficient performance and trial counsel's general failure to object throughout the trial, the court of appeals determined that "[m]any of the objections that Mr. Williams now proposes in hindsight over the course of his briefing to us would not have had a reasonable opportunity for success, and might have underscored the testimony that he posits here as significant."  *Williams*, 2021 WL 3877939, at *18.  With respect to the expert's testimony specifically, the court of appeals opined that even if "such part of the nurse's expert testimony that arguably

went beyond the bounds of her records" was excluded, "we see no reasonable probability that the jury's result would have been different than it was."  *Id*.

As an initial matter, this succinct analysis by the court of appeals is entitled to AEDPA deference.  This is because even unexplained summary decisions are presumed to constitute an adjudication on the merits for purposes of the AEDPA.  *See Harrington v. Richer*, 562 U.S. 86 (2011); *Werth v. Bell*, 692 F.3d 486, 493 (6th Cir 2012).  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Id.* at 784.

The critical question before this Court is whether the court of appeals applied *Strickland* unreasonably in determining that counsel's failure to object was not prejudicial.  The state court decision reflects that the Tenth District Court of Appeals correctly identified and summarized the *Strickland* standard applicable to Petitioner's claims of ineffective assistance.  The Undersigned rejects Petitioner's argument that the court of appeals incorrectly applied a plain error standard to his claim, as opposed to cross referencing or relying on an earlier more detailed discussion of the expert's testimony to instruct the *Strickland* inquiry.  The Court also rejects Petitioner's argument that the court of appeals unreasonably determined the facts and mischaracterized the medical records as reflecting "vaginal injury" as opposed to reflecting dye uptake.

Although the Court of Appeals primarily analyzed the impact of the expert's testimony within the contours of its plain error analysis resolving Petitioner's claim of trial court error, the analysis is still instructive.  The court of appeals noted that it was only the more general testimony concerning what may be "typical" in sexual assault

situations that was objectionable and exceeded the scope of the provided documents.
The more significant evidence of bruising and abrasions was noted in the examination
records and documented in the photographs.  With respect to the "fight, flight or freeze"
testimony, Nurse Stevens spoke in general terms and not specifically about the victim's
behavior.  Although there was a discussion regarding delayed reporting, that testimony
was also general in nature and unlikely to have influenced the jury's decision in a case
where the incident was disclosed and ultimately reported to law enforcement within only
a few days.

Additionally, the cases cited by Petitioner – *State v. Walls*, 104 N.E.3d 280 (Ohio
App. 6th Dist. 2018) and *State v. McGhee*, No. 2014-T-0106, 2017-Ohio-5773, 2017 WL
2951775 (Ohio App. 11th Dist. June 10, 2017) – are not directly applicable to this
federal habeas case.  Habeas review is not direct appellate review of a conviction.  It is
not the role of this Court in habeas corpus to determine whether a state discovery rule
was violated or opine whether this Court would have permitted or limited the testimony
of the expert at trial.  And in the cases cited by Petitioner, the State's experts provided
far more specific opinions regarding delayed disclosure and victim bolstering than what
occurred here.

The trial record also refutes Petitioner's arguments.  The record reflects that
Counsel engaged the expert during cross examination in an attempt to establish that the
blue dye update could be caused by something other than sexual assault.  (Doc. 7-2, at
PAGEID # 869-71.).  Trial counsel also challenged the expert's "statistics" regarding
delayed reporting, (*Id*. at PAGEID # 865-868), attempted to show the expert lacked
recent training or proper evaluation of her technique regarding the application of the

toluidine blue dye, (*Id*. at PAGEID # 869-872), and clarified, twice, that the witness was *not* opining that a sexual assault occurred. To that end, the following exchange occurred:

> Q. Well, Nurse Stevens, you're not suggesting that this proves a sexual assault occurred, are you?
> A. I didn't suggest that.
> * * *
> Q. Right. And so you're not in a position to draw any conclusion, medical or otherwise, whether or not a sexual assault occurred in this case, are you?
> A. No.
> Q. Nor do you offer any such opinion to this jury?
> A. No.

(Doc. 7-2, at PAGEID # 870, 873.) Petitioner's first subclaim does not warrant habeas corpus relief.

### b. Failure to Object to Hearsay and Vouching

As stated above, the Tenth District Court of Appeals rejected Petitioner's claim of trial counsel ineffectiveness for failing to object to hearsay testimony and prosecutorial misconduct, and that determination is deserving of AEDPA deference. The Court of Appeals noted that "many of the objections that Mr. Williams now proposes in hindsight over the course of his briefing to us would not have had a reasonable opportunity for success, and might have underscored the testimony that he posits here as significant." *State v. Williams*, No. 19AP-824, 2021-Ohio-3006, 2021 WL 3877939, at *18 (Ohio App. 10th Dist. Aug. 31, 2021). Additionally, the Court of Appeals determined that "even had Michelle's testimony about the message received by her husband the evening of the event (before she spoke with A.P. the next day) been excluded, along with such part of the nurse's expert testimony that arguably went beyond the bounds of her records, we

see no reasonable probability that the jury's result would have been different than it was." *Id*.

The Court of Appeals also considered Petitioner's arguments regarding the misconduct of the prosecutor in the section of its decision addressing Petitioner's freestanding claim of prosecutorial misconduct. The Court of Appeals reviewed Petitioner's various allegations regarding the hearsay evidence and prosecutorial misconduct for plain error, because trial counsel failed to object to the evidence or alleged misconduct during trial. The court of appeals determined that all of the alleged misconduct either did not "qualify as obvious error," or did not "present a reasonable probability of a different outcome," or "both." *Williams*, 2021 WL 3877939, at 11. Specifically, the Court determined:

> {¶ 55} Mr. Williams, for example, now protests that the state elicited and referred to information that A.P. "was a mother and a breast cancer survivor" and activist. Appellant's Brief at 11. But that sort of background information is not wholly and intrinsically out of bounds. *Compare Smith*, 2002-Ohio-6659, at ¶ 46, 97 Ohio St.3d 367, 780 N.E.2d 221 ("since the testimony merely elicited background information and was 'not overly emotional or directed to the penalty to be imposed' [in the capital case], the remarks do not constitute plain error") (citations omitted). A.P.'s status as a mother was reflected in the electronic messages to which both sides cited, explained certain relevant scheduling decisions she made, and was further raised in relevant conversation with Mr. Williams and in testimony about her brief *My Little Pony* conversation with Mr. Crook's daughter (who was about her own daughter's age). *See, e.g.,* Tr. Vol. II at 47, 50, 60. She also testified that her desire to see her daughter and her successful battle against cancer informed her response to Mr. Williams's conduct. *Id.* at 69 ("all I could think about was my daughter and staying alive so I could get home to her alive"); 70 ("If I just let him do what he wanted, then he would let me go. And I kept thinking, like: You didn't beat cancer just to die here in this rape cave"). Testimony as to the nature of A.P.'s discussions with Mr. Williams on the day at issue, including their discussion of her cancer survivor status, *id.* at 56 ("We talked about my journey through cancer and just life"), were also relevant. We do not find that A.P.'s maternal or cancer survivor status (or similar background about A.P.'s devotion to her job as a make-up artist concentrating on weddings, which responsibilities she said figured into why

she didn't report the conduct the following day, *see, e.g., id.* at 75-76, 79) was abused here. The trial court's instructions, moreover, cautioned the jury: "[d]o not allow any consideration of sympathy for or prejudice against anyone to influence your deliberations." Tr. Vol. III at 147. We see no obvious error regarding the use of this testimony, but in any event we find no reasonable probability (so as to undermine confidence in the verdict) that the jury would have reached a different result had objections been made and sustained.

{¶ 56} In this regard, we note that the portion of the state's closing argument block quoted at page 12 of Appellant's Brief (starting: "It's because she has a daughter[,]" and continuing through references to A.P.'s work and cancer-fighting activities) were offered not as a bald "request for guilty verdicts," *compare* Appellant's Brief at 12, but as part of an argument regarding A.P.'s motivations for reporting the conduct and undergoing the necessarily invasive medical examinations: A.P. "has no motive to lie" and "gets nothing out of this," the prosecutor urged, so "[w]hy go through all of this * * *? It's because she has a daughter [etc.]." Tr. Vol. III at 135-36. We do not find obvious error in the lack of a trial court interruption there, and we do not find any reasonable probability that the argument affected the result.

{¶ 57} Mr. Williams also takes issue with certain observations made by the police patrolman, A.P.'s friend Michelle, and the examining nurse. Appellant's Brief at 11. Yet Mr. Williams identifies no prosecutorial misconduct in the questions that elicited those responses. The patrol officer, for example, was asked to describe A.P.'s "demeanor" when he interviewed her at the hospital. Tr. Vol. II at 26. We see no obvious error in not cutting off a response. Nor was there obvious error in not striking the response then given: "she was polite. She was upset. That's pretty much it. She was forthright." *Id.* at 26-27. Mr. Williams attempts to make something of the word "forthright," but in this context, allowing that word to stand as descriptive of unhesitating and concise demeanor, *compare* dictionary.com (defining "forthright" to mean "going straight to the point; frank; direct; outspoken"), does not amount to obvious error. Nor do we find obvious error in the trial court not intervening to cut off the prosecutor's question to Michelle about A.P.'s "general personality," Tr. Vol. II at 187, or to strike that response, *id.* at 187-88. Further, neither these responses nor the patrolman's had any reasonable probability of affecting the result of the trial. And Mr. Williams does not explain or offer a citation under his first assignment of error for his complaint that nurse Stevens "corroborated A.P.'s character." *See* Appellant's Brief at 11.

{¶ 58} Mr. Williams also takes issue with the prosecutor's inquiry into and discussions of the nature of his business. Appellant's Brief at 12-13. But Mr. Williams testified on direct examination that he had a business purpose for meeting A.P. at the bar, *see* Tr. Vol. III at 19 ("So I was really just kind of

like more of a business relationship with her. So when we kind of like established that we were going to meet up, I asked Kevin to come with me for that reason"; his plan was to "talk a little bit about business. And I was actually trying to hook Kevin and her up"). The nature of Mr. Williams's business and his interest in A.P. was appropriate ground for cross-examination. And our review of his responses leaves us still uncertain about what, precisely, his business entailed. *See, e.g., id.* at 13 ("I own an energy company called Yocum Telecom. Credit card processing."); 33 ("It's kind of hard to sum up. Basically, I'm a re-seller of like all the major like cell phone companies, TV companies. We also partner with AEP in Cincinnati * * * Basically, I resell their services at a discounted price"); 34 (on typical work day, "I do a lot of meetings. I have like Starbucks, Panera's. I meet with a lot of other people. I also train and teach people how they can start up their home-based business on the side," teaching them "[h]ow to acquire customers, how to show the customers the savings"). And according to the trial transcript, it was Mr. Williams who introduced the word "pyramid" into this discussion: asked whether "these customers * * * kind of report underneath you?", he answered, "Is it pyramid? Is that what you're trying to get at?" *Id.* at 35. We find no plain error involving the questions into or comment on Mr. Williams's business operations.

{¶ 59} We also find no plain error in the prosecutor's closing argument that Mr. Williams was "control[ling]," (and we specifically reject any suggestion that there is a reasonable probability that the outcome of this case was affected by prosecution comments that he referred to his "roommates" as his "tenants" and "has the house professionally cleaned[,]" Appellant's Brief at 13-14, citing Tr. Vol. III at 134; brief's emphasis omitted). The state's argument that "[a] rapist would * * * think he can manipulate the system and think he could control it, think that they could talk their way out. And that's what Mr. Williams was doing," *id.*, may have been made in response to defense counsel's argument that Mr. Williams cooperated with the police because "[h]e had nothing to hide * * * * [and] everything to offer * * * * He's not a rapist. He told the truth," *id.* at 118. And the trial court instructed the jury that "[e]vidence does not include any statement of counsel made during this trial," and that "[t]he opening statements and the closing arguments * * * * are not evidence." *Id.* at 140. Again, we conclude that there is no reasonable probability that the jury would have reached a different result absent the prosecutorial comment.

*Williams*, 2021 WL 3877939, at 11-12.

It is beyond dispute that this Court's role on habeas review is limited.

Petitioner must overcome the strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance, and he must overcome the

presumption that "the challenged action 'might be considered sound trial strategy."
*Strickland*, 466 U.S. at 694.  And in addition to that difficult task, Petitioner must also
show that there is "a reasonable probability that, but for counsel's unprofessional errors,
the result of the proceeding would have been different."  *Id.*  But even if Petitioner can
meet this difficult standard, he is not entitled to habeas relief unless he can show that
the Court of appeals decision rejecting his ineffective assistance of counsel claim was
so obviously wrong that its error lies "beyond any possibility for fairminded
disagreement."  Here, Petitioner has not overcome his hurdle.

When reviewing a claim of ineffective assistance of counsel for failure to object to
hearsay, courts begin with a strong presumption that counsel's conduct falls within the
wide range of reasonable professional assistance. *Schauer v. McKee*, 401 F. App'x 97,
100 (6th Cir. 2010) (citations omitted).  Moreover, reasonable decisions are permissible
even if mistaken.  *Id.* (citing *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002)).
In *Schauer*, the Sixth Circuit concluded that defense counsel's failure to object to
hearsay was reasonable because counsel managed to glean inconsistencies from the
hearsay and use those to undermine the complainant's credibility. *Id.*  Acknowledging
that counsel's strategy was reasonable, even if ultimately unsuccessful, the Sixth Circuit
reiterated that the Constitution does not guarantee every criminal defendant a
successful defense. *Id.* (citations omitted).  Here, the record reflects that counsel
attempted to use some of this testimony to establish inconsistencies in the victim's prior
statements and reporting.  As such, the failure of Petitioner's counsel to object to certain
hearsay indicates a strategic decision and does not offend prevailing professional
norms or qualify as deficient performance.

The Undersigned also does not find unreasonable the Tenth District Court of Appeals' decision that the unmade objections either did not have a reasonable probability for success or would have done more harm than good by underscoring undesirable testimony. Courts have recognized that "repeated objections can work to the detriment of a defendant, either by exasperating the jury or by drawing undue attention to damaging testimony." *Braden v. Bagley*, No. 2:04-cv-842, 2020 WL 6873094, at *38 (S.D. Ohio Nov. 23, 2020), citing *Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) ("A competent trial strategy frequently is to mitigate damaging evidence by allowing it to come in without drawing additional attention to it, such as an objection would.").

Finally, the Undersigned rejects Petitioner's argument that the state court's decision was an unreasonable application of *Strickland* because this case involved a "he said/she said credibility battle" and therefore counsel's failure to object to all of the contested issues resulted in more prejudice than would exist if the evidence of guilt was stronger. The first case Petitioner cites in support of this argument – *Brown v. Smith*, 551 F.3d 424, 434-35 (6th Cir. 2008) – is distinguishable because that case involved a habeas court's *de novo* review of a petitioner's ineffective assistance of counsel claim premised on trial counsel's failure to investigate impeachment material. The second case, *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005), is procedurally on point in that it involved a doubly deferential review pursuant to AEDPA, but that case turned on what the Sixth Circuit characterized as counsel's failure to object to "egregiously improper" prosecutorial misconduct. Specifically:

> the prosecutor accused [the defendant] of "lying"; stated that the complaining witness was "absolutely believable"; accused Dr. Steiner of

testifying "wrongfully" and "unethically," and telling "a lie"; stated that defense counsel was telling "a lie"; severely misrepresented the testimony of Dr. Omley, the examining physician; stated (incorrectly) that a finding in favor of Hodge required a finding that Fenn's great-grandmother and great-aunt were "absolute liars"; suggested (without any evidence) that Hodge was a frequent underage drinker; insinuated (without any evidence) that Hodge wanted to get part of the prosecutor's family's Social Security checks; suggested that Hodge was the type of person the jury should fear running into at night; and generally argued that the jury should convict Hodge on the basis of his bad character.

*Hodge*, 426 F.3d at 386.  Those are not the facts here.  Petitioner received fair representation by attorneys of his choosing and none of the instances of allegedly deficient performance to which he complains prejudiced the outcome of his trial. Petitioner did not receive the outcome he wanted but that does not require a reversal of his conviction.

The Tenth District Court of Appeals issued a lengthy decision resolving all of Petitioner's claims after a careful consideration.  The last paragraph of the court of appeals' decision is compelling and reasonably summarized the issues in this case:

> {¶ 85} Mr. Williams did not receive a perfect trial. The prosecutor's statement of personal belief on what the evidence showed was wrong; the nurse's testimony could have been limited somewhat; the objection during Michelle's testimony (with the resulting court instruction to the witness) could have come earlier. But, on our review of the record as a whole, he did receive a fair trial. The jury saw A.P. testify and give her account under vigorous cross-examination. And they saw Mr. Williams testify and provide his version of events (that did not reflect what Mr. Crook said that Mr. Williams had told him about A.P. being the sexual aggressor who "attacked him," but that did include exploration as to the context in which A.P. had said no, and did include his having felt "used" when he learned that A.P. had departed). And while the physical evidence was not "definitive," Appellant's Brief at 52, Mr. Williams does not argue that the nurse's description of redness, bruising, and abrasions should have been excluded. No trial errors, alone or in combination, deprived Mr. Williams of his rights to a fair trial.

*Williams*, 2021 WL 3877939, at 18. The Undersigned cannot conclude that the decision of the Court of Appeals was unreasonable and Petitioner's habeas petition should be denied.

## VI. CONCLUSION

For the foregoing reasons, the Undersigned recommends the Petition be denied as without merit.

### IT IS HEREBY ORDERED THAT:

The motion to expand the record, Doc. 12, is **GRANTED in part** and **DENIED in part**. The Court **GRANTS** Petitioner's unopposed request to expand the record to include Petitioner's "Criminal Rule 16 Demand and Motion for Discovery" and "Request for Notice of Intention to Use Evidence" (filed 9/7/2018), attached as Exhibit 1 to Petitioner's Motion to Expand the Record (Doc. 12-1), and the State's "Identification of Discovery Provided" (filed 10/11/2018), attached as Exhibit 2 (Doc. 12-2). The Court **DENIES** Petitioner's request to expand the record with the SANE "exam forms" and accompanying photographs, identified as trial exhibits D and D-1 through D-23.

### IT IS THEREFORE RECOMMENDED THAT:

1.	Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2.	A certificate of appealability should not issue with respect to the petition because Petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See*

*Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).[1]

 *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

---

[1]*See Winburn v. Nagy*, 956 F.3d 909, 912 (6th Cir. 2020) ("Congress knew how to exempt § 2241 petitions from the certificate of appealability requirement when it wished, indicating that Congress chose to require certificates of appealability for state but not federal prisoners who invoke § 2241.").

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KYLE J. WILLIAMS,                           Case No. 2:22-cv-4125
      Petitioner,

                            Watson, J.
      vs.                                  Bowman, M.J.

WARDEN, MADISON CORRECTIONAL
INSTITUTION,
      Respondent.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).